**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| SABRINA BEDFORD, TIMOTHY STROUSE, and JACKLYN ALICEA-MALDONADO, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CERNER CORPORATION D/B/A ORACLE HEALTH, and ADVENTIST HEALTH SYSTEM/SUNBELT, INC.,<br><br>Defendants. | CASE NO:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR A JURY TRIAL**<br><br>**DECLARATORY AND PERMANENT INJUNCTIVE RELIEF REQUESTED** |

Plaintiffs Sabrina Bedford, Timothy Strouse, and Jacklyn Alicea-Maldonado, on behalf of themselves and all similarly situated persons, allege the following against Cerner Corporation d/b/a Oracle Health ("Oracle Health" or "Oracle") and Adventist Health System/Sunbelt, Inc. (hereinafter "Advent Health" or "Advent"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs make these allegations based upon personal knowledge of the facts pertaining to Plaintiffs and on information and belief as to all other matters derived from, among other things, investigation by counsel and review of public documents.

## I. INTRODUCTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Advent is a healthcare provider based in Florida[1] and operates four Chicago-area hospitals.[2]

3. Plaintiff Sabrina Bedford ("Bedford") is a former patient of Advent.

4. Plaintiff Timothy Strouse ("Strouse") is a former patient of Advent.

5. Plaintiff Jacklyn Alicea-Maldonado ("Maldonado") is a current patient of Advent.

6. Advent's "former electronic health record ('EHR') software vendor, Cerner," informed Advent that on "March 15, 2025, Oracle Health, of which Cerner is now a part, shared with us that an unauthorized third party gained access to legacy Cerner systems as early as January 22, 2025, and obtained certain data from those legacy Cerner systems." (the "Data Breach").[3]

7. "On October 31, 2025, Oracle Health provided [Advent] with a list of patients whose information was involved in this incident." *Id.*

8. Defendants store a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI")—together "PII/PHI"—about their current and former patients. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in the Data Breach.

---

[1] AdventHealth, *Who We Are,* https://www.adventhealth.com/who-we-are (last visited Dec. 18, 2025).

[2] AdventHealth, *AdventHealth to rename four Chicago-area hospitals*, Apr. 1, 2022, https://www.adventhealth.com/news/adventhealth-rename-four-chicago-area-hospitals.

[3] AdventHealth, Data Breach Notice Letter to Current and Former Patients (Dec. 3, 2025).

9. The types of PII/PHI exposed include "name, Social Security number, and information included within patient medical records," such as medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment. *Id.*

10. It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to current and former patients' PII/PHI.

11. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Defendants' failures placed the Class's PII/PHI in a vulnerable position—rendering them easy targets for cybercriminals.

12. Plaintiffs are data breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

13. The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, Defendants' current and former patients' private information was exactly that—private. Now their private information is forever exposed and unsecured.

## II. PARTIES

14. Plaintiff Sabrina Bedford is a natural person and citizen of Chicago, Illinois. She is domiciled in Illinois.

15. Plaintiff Timothy Strouse is a natural person and citizen of Braidwood, Illinois. He is domiciled in Illinois.

16. Plaintiff Jacklyn Alicea-Maldonado is a natural person and citizen of Westchester, Illinois. She is domiciled in Illinois.

17. Defendant Cerner Corporation d/b/a Oracle Health is a Delaware corporation with its principal place of business located at 8779 Hillcrest Road, Kansas City, MO 64138.[4]

18. Defendant Advent is a healthcare service organization with dozens of locations across the United States, and is headquartered at 900 Hope Way Altamonte Springs, FL 32714.[5]

## III. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiffs Bedford, Strouse and Maldonado, and Defendants Oracle and Advent, are citizens of different states.

[4] *Oracle Acquires Cerner to Form Oracle Health; The Future of Healthcare*, Oracle, https://www.oracle.com/health/acquisition-of-cerner-the-future-of-healthcare/ (last visited Nov. 6, 2025).

[5] *AdventHealth Today,* https://www.adventhealth.com/legacy/adventhealth-today (last visited Dec. 26, 2025).

There are over 100 putative Class Members.

20. This Court has personal jurisdiction over Defendants because Advent is headquartered in Florida and both Defendants regularly conduct business in Florida, and have sufficient minimum contacts in Florida.

21. Venue is proper in this Court because Advent's principal office is in this District.

## IV. FACTUAL BACKGROUND

***Defendants Collected and Stored the PII/PHI of Plaintiffs and the Putative Classes***

22. Advent is a healthcare provider based in Florida.

23. Advent previously used Oracle Health (previously Cerner Corporation) which is a third-party Electronic Health Records ("EHR") vendor used by many healthcare providers.

24. As part of their business, Defendants receive and maintain the PII/PHI of thousands of their current and former patients.

25. In collecting and maintaining the PII/PHI, Defendants agreed it would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII/PHI.

26. Under state and federal law, businesses like Defendants have duties to protect their current and former patients' PII/PHI and to notify them about breaches.

***Defendants' Data Breach***

27. On March 15 2025, Advent was informed by Oracle Health that "an unauthorized third party gained access to legacy Cerner systems as early as January 22, 2025, and obtained certain data."[6]

28. On October 31, 2025, Oracle Health provided Advent with a "list of patients whose information was involved in this incident." *Id.*

29. Defendants store a litany of PII and PHI about their current and former patients. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in the Data Breach.

30. The types of PII/PHI exposed included "name, Social Security number, and information included within patient medical records." *Id.*

31. Currently, the precise number of persons injured is unclear. But the size of the putative class can be ascertained from information in Defendants' custody and control. And upon information and belief, the putative class is over one hundred members—as it includes Advent's current and former patients.

32. Despite their knowledge that highly sensitive PII and PHI of Plaintiffs and class members were exposed, Defendants waited until December 3, 2025, before they began notifying the class—a full 315 days after the Data Breach began.

33. Defendants kept the Class in the dark—thereby depriving Class Members of the opportunity to try and mitigate their injuries in a timely manner.

---

[6] AdventHealth, Data Breach Notice Letter to Current and Former Patients (Dec. 3, 2025).

34. When Defendants did notify Plaintiffs and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of identity theft, warning Plaintiffs and the Class: "We remind you it is always advisable to be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity." *Id.*

35. Defendants failed their duties when their inadequate security practices caused the Data Breach. Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. Defendants' negligence caused widespread injury and monetary damages.

36. Defendants have done little to remedy their data breach. While Defendants have offered some victims credit monitoring and identity-related services, such offerings are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendants inflicted upon them.

37. Because of Defendants' data breach, the sensitive PII/PHI of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

38. Plaintiffs Sabrina Bedford, Timothy Strouse, and Jacklyn Alicea-Maldonado were patients of Advent. In connection with providing services to Plaintiffs, Defendants obtained and maintained Plaintiffs' PII/PHI.

39. Plaintiffs were injured by Defendants' data breach.

***Plaintiff Sabrina Bedford***

40. Plaintiff Sabrina Bedford is a patient of Advent, one of Oracle's former healthcare provider clients, and received treatment from Advent prior to the Data Breach. As a condition of receiving medical services, Ms. Bedford was required to provide her PII/PHI to Defendants, including but not limited to her name, Social Security Number, and medical information in connection with Oracle's services contracted by her healthcare provider.

41. Ms. Bedford typically takes measures to protect her PII/PHI and is very careful about sharing her PII/PHI. Ms. Bedford has never knowingly transmitted unsecured PII/PHI over the internet or other unsecured source. She stores any documents containing her PII/PHI in a safe and secure location, and diligently chooses unique usernames for her passwords and online accounts.

42. In entrusting her PII/PHI to Defendants, Ms. Bedford believed that, as part of the payments for medical treatment and services, Defendants had implemented and maintained reasonable security and practices to protect her PII/PHI, including only contracting with third party vendors who would adequately protect her PII/PHI.

43. Had Ms. Bedford known that Defendants did not utilize reasonable data security measures, she would not have entrusted her PII/PHI to Defendants.

44. At the time of the Data Breach, Oracle retained Ms. Bedford's PII/PHI on its network with inadequate data security and in unencrypted form, causing Ms. Bedford's PII/PHI to be accessed and exfiltrated by cybercriminals in the Data

Breach.

45. Ms. Bedford received a Data Breach Notice on or around December 3, 2025, notifying her that her PII/PHI was improperly accessed by unauthorized third parties, including her name, Social Security Number, and information included within patient medical records, such as medical record numbers, doctors, diagnosis, medicines, test results, images, care, and treatment.

46. As a direct and proximate result of the Data Breach, Defendants caused and allowed to occur, Ms. Bedford has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the PII/PHI itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

47. Ms. Bedford will be forced to expend considerable time and effort including to monitor her accounts and credit files, changing her online account passwords, verifying the legitimacy of the Data Breach Notice, and researching the Data Breach, to protect herself from identity theft and fraudulent misuse of her PII/PHI, disclosed as a result of the Data Breach. She is also paying a monthly subscription of thirty dollars to an external credit monitoring service to help keep her credit safe as a result of the Data Breach.

48. Indeed, Ms. Bedford's PII/PHI that was compromised in the Data Breach has already been misused, evidenced by the significant increase in spam phone calls that she has received since the Data Breach and fraudulent online

purchases using her PII/PHI.

49. In addition, as a result of the Data Breach, Ms. Bedford also suffered diminution in the value of her PII/PHI, a form of intangible property that she entrusted to Defendants for the sole purpose of obtaining medical services.

50. Furthermore, Ms. Bedford has suffered significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Personal Information in the Data Breach. Ms. Bedford fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of her PII/PHI. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

51. As a result of the Data Breach, Ms. Bedford faces a lifetime risk of identity theft, as her PII/PHI compromised in the Data Breach includes sensitive data that cannot be changed.

52. Furthermore, Ms. Bedford's sensitive PII/PHI remains in Defendants' possession without adequate protection against known threats, exposing Sabrina Bedford to the imminent prospect of additional harm.

***Plaintiff Timothy Strouse***

53. Plaintiff Timothy Strouse is a former patient of Advent, one of Oracle's former healthcare provider clients, and received treatment from Advent prior to the Data Breach. As a condition of receiving medical services, Mr. Strouse was

required to provide his PII/PHI to Defendants, including but not limited to his name, Social Security Number and medical information, in connection with Oracle's services contracted by his healthcare provider.

54. Mr. Strouse typically takes measures to protect his PII/PHI and is very careful about sharing his PII/PHI. Mr. Strouse has never knowingly transmitted unsecured PII/PHI over the internet or other unsecured source. Mr. Strouse stores any documents containing his PII/PHI in a safe and secure location, and diligently chooses unique usernames for his passwords and online accounts.

55. In entrusting his PII/PHI to Defendants, Mr. Strouse believed that, as part of the payments for medical treatment and services, Defendants had implemented and maintained reasonable security and practices to protect his PII/PHI, including only contracting with third party vendors who would adequately protect his PII/PHI.

56. Had Mr. Strouse known that Defendants did not utilize reasonable data security measures, he would not have entrusted his PII/PHI to Defendants.

57. At the time of the Data Breach, Oracle retained Mr. Strouse's PII/PHI on its network with inadequate data security and in unencrypted form, causing Mr. Strouse's PII/PHI to be accessed and exfiltrated by cybercriminals in the Data Breach.

58. Mr. Strouse received a Data Breach Notice on or around December 3, 2025, notifying him that his PII/PHI was improperly accessed by unauthorized third parties, including his name, Social Security Number, and information

included within patient medical records, such as medical record numbers, doctors, diagnosis, medicines, test results, images, care, and treatment.

59. As a direct and proximate result of the Data Breach, Defendants caused and allowed to occur, Mr. Strouse has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the PII/PHI itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale.

60. Mr. Strouse has been and will be forced to expend considerable time and effort including to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of the Data Breach Notice, and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his PII/PHI, disclosed as a result of the Data Breach. He has already spent about six hours watching and reading news coverage about the Data Breach in efforts to prevent future related harm.

61. In addition, as a result of the Data Breach, Mr. Strouse also suffered diminution in the value of his PII/PHI, a form of intangible property that he entrusted to Defendants for the sole purpose of obtaining medical services.

62. Furthermore, Mr. Strouse has experienced significant worry and feelings of anxiety and emotional distress regarding the disclosure of his PII/PHI in the Data Breach. Mr. Strouse fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing

emotional distress over the unauthorized disclosure of his PII/PHI. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

63. As a result of the Data Breach, Mr. Strouse faces a lifetime risk of identity theft, as his PII/PHI compromised in the Data Breach includes sensitive data that cannot be changed.

64. Mr. Strouse's sensitive PII/PHI remains in Defendants' possession without adequate protection against known threats, exposing Mr. Strouse to the imminent prospect of additional harm.

***Plaintiff Jacklyn Alicea-Maldonado***

65. Plaintiff Jacklyn Alicea-Maldonado is a patient of Advent, one of Oracle's former healthcare provider clients, and received treatment from Advent prior to the Data Breach. As a condition of receiving medical services, Ms. Alicea-Maldonado was required to provide her PII/PHI to Defendants, including but not limited to her name, Social Security Number, and medical information in connection with Oracle's services contracted by her healthcare provider.

66. Ms. Alicea-Maldonado typically takes measures to protect her PII/PHI and is very careful about sharing her PII/PHI. Ms. Alicea-Maldonado has never knowingly transmitted unsecured PII/PHI over the internet or other unsecured source. She stores any documents containing her PII/PHI in a safe and secure location, and diligently chooses unique usernames for her passwords and online accounts.

67. In entrusting her PII/PHI to Defendants, Ms. Alicea-Maldonado believed that, as part of the payments for medical treatment and services, Defendants had implemented and maintained reasonable security and practices to protect her PII/PHI, including only contracting with third party vendors who would adequately protect her PII/PHI.

68. Had Ms. Alicea-Maldonado known that Defendants did not utilize reasonable data security measures, she would not have entrusted her PII/PHI to Defendants.

69. At the time of the Data Breach, Oracle retained Ms. Alicea-Maldonado's PII/PHI on its network with inadequate data security and in unencrypted form, causing her PII/PHI to be accessed and exfiltrated by cybercriminals in the Data Breach.

70. Ms. Alicea-Maldonado received a Data Breach Notice on December 3, 2025, notifying her that her PII/PHI was improperly accessed by unauthorized third parties, including her name, Social Security Number, and information included within patient medical records, such as medical record numbers, doctors, diagnosis, medicines, test results, images, care, and treatment.

71. As a direct and proximate result of the Data Breach, Defendants caused and allowed to occur, Ms. Alicea-Maldonado has suffered, and imminently will suffer, injuries-in-fact and damages, including the unauthorized disclosure of the PII/PHI itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes

and/or has been sold for such purposes and posted on the dark web for sale.

72. Ms. Alicea-Maldonado has been and will be forced to expend considerable time and effort including to monitor her accounts and credit files, changing her online account passwords, verifying the legitimacy of the Data Breach Notice, and researching the Data Breach, to protect herself from identity theft and fraudulent misuse of her PII/PHI, disclosed as a result of the Data Breach. She has already spent approximately 15 hours monitoring her credit and researching data security protocols in the first few weeks after being notified of the breach. She has also reviewed various websites researching instructions on protecting her credit in efforts to prevent future related harm.

73. Indeed, Ms. Alicea-Maldonado's PII/PHI that was compromised in the Data Breach has already been misused, evidenced by an increase in spam phone calls that she has received since the Data Breach and a fraudulent purchase using her PII/PHI.

74. In addition, as a result of the Data Breach, Ms. Alicea-Maldonado also suffered diminution in the value of her PII/PHI, a form of intangible property that she entrusted to Defendants for the sole purpose of obtaining medical services.

75. Furthermore, Ms. Alicea-Maldonado has suffered significant worry and feelings of anxiety and emotional distress regarding the disclosure of her PII/PHI in the Data Breach. Ms. Alicea-Maldonado fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of her PII/PHI.

This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

76. As a result of the Data Breach, Ms. Alicea-Maldonado faces a lifetime risk of identity theft, as her PII/PHI compromised in the Data Breach includes sensitive data that cannot be changed.

77. Ms. Alicea-Maldonado's sensitive PII/PHI remains in Defendants' possession without adequate protection against known threats, exposing her to the imminent prospect of additional harm.

***Consumers Prioritize Data Security***

78. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[7] Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[8]

[7] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited Jan. 9, 2026).

[8] *Id.* at 3.

b. 89% of consumers stated that "I care about data privacy."[9]

c. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy."[10]

d. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[11]

e. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[12]

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

79. Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII/PHI is used;

b. diminution in value of their PII/PHI;

c. compromise and continuing publication of their PII/PHI;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

---

[9] *Id.* at 3.

[10] *Id.*

[11] *Id.*

[12] *Id.* at 11.

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII/PHI; and

h. continued risk to their PII/PHI—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fail to take appropriate measures to protect the PII/PHI.

80. Stolen PII/PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII/PHI can be worth up to thousands depending on the type of information obtained.[13]

81. The value of Plaintiffs' and Class's PII/PHI on the black market is considerable. Stolen PII/PHI trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

82. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell PII/PHI far and wide.

83. One way that criminals profit from stolen PII/PHI is by creating

[13] Ben Luthi, Here's What Your Data Sells for on the Dark Web, Experian, June 30, 2025, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-isselling-for-on-the-darkweb/#:~:text=Quick%20Answer,Price%20Index%20by%20Privacy%20Affairs.

comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII/PHI, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

84. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

85. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

86. Defendants disclosed the PII/PHI of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII/PHI of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen

PII/PHI.

87. Defendants' failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

88. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

89. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[14]

90. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

91. In fact, according to the cybersecurity firm Mimecast, 90% of

---

[14] *2024 data breach Report*, Identity Theft Resource Center (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited Jan. 9, 2026).

[15] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Nov. 6, 2025.

healthcare organizations have experienced cyberattacks.[16]

92. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

93. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendants—should use to protect against unlawful data exposure.

94. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business. There, the FTC set guidelines for what data security principles and practices businesses must use.[17] The FTC declared that, inter alia, businesses must:

a. protect the personal customer information that they keep;
b. properly dispose of personal information that is no longer needed;
c. encrypt information stored on computer networks;
d. understand their network's vulnerabilities; and
e. implement policies to correct security problems.

---

[16] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Nov. 6, 2025).

[17] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

95. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

96. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network;

f. verify that third-party service providers use reasonable security measures.

97. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

98. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former patients' data constitutes an unfair act or practice prohibited by Section 5 of the

FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

99. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

100. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

101. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

102. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

103. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly transactions and code sets to maintain the privacy and security of protected health information.[18]

104. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI are properly maintained.[19]

105. The data breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or

---

[18] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[19] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI

in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

106. Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

## V. CLASS ACTION ALLEGATIONS

107. Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure. The classes that Plaintiffs seek to represent are defined as follows:

**<u>Oracle Health Nationwide Class</u>**
All individuals residing in the United States whose PII/PHI was compromised in the Oracle Health Data Breach, which occurred on or around January 2025, including all those individuals who receive notice of the Data Breach.

**<u>Oracle Health Illinois Subclass</u>**
All individuals residing in Illinois whose PII/PHI was compromised in the Oracle Health Data Breach, which occurred on or around January 22, 2025, including those individuals who receive notice of the Data Breach.

**<u>AdventHealth Healthcare Provider Nationwide Subclass</u>**
All individuals residing in the United States whose PII/PHI was compromised in the Oracle Health Data Breach, which occurred on or around January 22, 2025, which information was provided to Oracle Health by Advent, including all those individuals who receive notice of the Data Breach.

**<u>AdventHealth Illinois Subclass</u>**

> All individuals residing in Illinois whose PII/PHI was compromised in the Oracle Health Data Breach, which occurred on or around January 22, 2025, which information was provided to Oracle Health by AdventHealth, including those individuals who receive notice of the Data Breach.

108. Excluded from the Classes are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants' officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

109. Plaintiffs reserve the right to amend the class definition.

110. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

111. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

112. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 100 members.

113. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same data breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

114. Adequacy. Plaintiffs will fairly and adequately protect the proposed

Class's common interests. Their interests do not conflict with Class Members' interests. Moreover, Plaintiffs have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

115. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII/PHI;
b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
c. if Defendants were negligent in maintaining, protecting, and securing PII/PHI;
d. if Defendants breached contract promises to safeguard Plaintiffs' and the Class's PII/PHI;
e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;
f. if Defendants' Breach Notice was reasonable;
g. if the Data Breach caused Plaintiffs' and the Class's injuries;

h. what the proper damages measure is; and

i. if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

116. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Classes)**

117. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

118. Plaintiffs and the Class (or their third-party agents) entrusted their PII/PHI to Defendants on the premise and with the understanding that

Defendants would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

119. Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

120. Defendants have full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

121. Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiffs and Class Members' PII/PHI.

122. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

123. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

124. Defendants knew or reasonably should have known that the failure to

exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

125. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendants with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

126. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' PII/PHI.

127. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the Class Members' sensitive PII/PHI.

128. Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI Defendants had collected and stored and the foreseeable consequences of a data breach,

including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

129. Similarly, under HIPAA, Defendants had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiffs' and Class Members' PHI.

130. Defendants violated their duties under HIPAA by failing to use reasonable measures to protect PHI and by not complying with applicable regulations detailed above. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of PHI that Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

131. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendants hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII/PHI —whether by malware or otherwise.

132. PII/PHI is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiffs' and Class Members' and the importance of exercising reasonable care in handling it.

133. Defendants improperly and inadequately safeguarded the PII/PHI of

Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

134. Defendants breached these duties as evidenced by the Data Breach.

135. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII/PHI by:

a. Disclosing and providing access to this information to third parties

b. Failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in their employ who were responsible for making that happen

136. Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

137. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

138. Defendants have admitted that the PII/PHI of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

139. As a direct and traceable result of Defendants' negligence and/or

negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

140. Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Classes)**

141. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

142. Plaintiffs and Class Members either directly contracted with Defendants or Plaintiffs and Class Members were the third-party beneficiaries of contracts with Defendants.

143. Plaintiffs and Class Members (or their third-party agents) were required to provide their PII/PHI to Defendants as a condition of receiving services provided by Defendants. Plaintiffs and Class Members (or their third-party agents)

provided their PII/PHI to Defendants or their third-party agents in exchange for Defendants' services.

144. Plaintiffs and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

145. Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

146. Plaintiffs and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII/PHI to Defendants or their third-party agents in exchange for services.

147. In turn, and through internal policies, Defendants agreed to protect and not disclose the PII/PHI to unauthorized persons.

148. Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

149. After all, Plaintiffs and Class Members (or their third-party agents) would not have entrusted their PII/PHI to Defendants (or their third-party agents) in the absence of such an agreement with Defendants.

150. Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendants.

151. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

152. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. Moreover, fair dealing may require more than honesty.

153. Defendants materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agents) by:

a. failing to safeguard their information;
b. failing to notify them promptly of the intrusion into their computer systems that compromised such information;
c. Failing to comply with industry standards;
d. Failing to comply with the legal obligations necessarily incorporated into the agreements;
e. Failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendants created, received, maintained, and transmitted.

154. In these and other ways, Defendants violated their duty of good faith

and fair dealing.

155. Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed above).

156. Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Classes)**

157. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

158. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

159. Defendants owed a duty to their current and former patients, including Plaintiffs and the Class, to keep this information confidential.

160. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII/PHI is highly offensive to a reasonable person.

161. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from

unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

162. The data breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

163. Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

164. Defendants acted with a knowing state of mind when they failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

165. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

166. As a proximate result of Defendants' acts and omissions, the private and sensitive PII/PHI of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed supra).

167. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI are still maintained by Defendants

with their inadequate cybersecurity system and policies.

168. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII/PHI of Plaintiffs and the Class.

169. In addition to injunctive relief, Plaintiffs, on behalf of themselves and Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

170. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

171. This claim is pleaded in the alternative to the breach of implied contract claim.

172. Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon Defendants. After all, Defendants benefitted from (1) using their PII/PHI to provide service, and (2) accepting payment.

173. Defendants appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

174. Plaintiffs and Class Members (or their third-party agents) reasonably

understood that Defendants would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

175. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI.

176. Instead of providing a reasonable level of security, or retention policies that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

177. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII/PHI and (2) payment because Defendants failed to adequately protect their PII/PHI.

178. Plaintiffs and Class Members have no adequate remedy at law.

179. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Classes)**

180. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

181. Given the relationship between Defendants and Plaintiffs and Class Members, where Defendants became guardian of Plaintiffs' and Class Members' PII/PHI, Defendants became a fiduciary by their undertaking and guardianship of the PII/PHI, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' PII/PHI; (2) to timely notify Plaintiffs and Class Members of a data breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

182. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII/PHI.

183. Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class Members (or their third-party agents) would not have entrusted Defendants, or anyone in Defendants' position, to retain their PII/PHI had they known the reality of Defendants' inadequate data security practices.

184. Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—

especially to secure their PII/PHI.

185. Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

186. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed supra).

**SIXTH CAUSE OF ACTION**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**(On Behalf of Plaintiffs and the Classes)**

187. Plaintiffs incorporate paragraphs 1 through 115 as though fully set forth herein.

188. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[20]

189. Unfair acts or practices that violate the FTC Act also violate FDUTPA.

190. Defendants violated FDUTPA because it violated the FTC Act, as alleged above class members would never have allowed Defendants to access, collect, or maintain their PII had they known that Defendants' representations regarding the safety and security of its products and services were false.

[20] Fla. Stat. § 504.204(1).

191. Defendants' collection and maintenance of Plaintiffs' and Class Members' PII were actions central to its business and affected commerce.

192. The class of people that the FTC Act and FDUTPA were intended to protect include Plaintiffs and Class Members.

193. As a direct and proximate result of Defendant's violations of FDUTPA, Plaintiffs and Class Members suffered actual damages. Plaintiffs and Class Members received services that were less valuable than what Defendants were obligated to provide and for which Defendants were paid, either directly or indirectly, by Plaintiffs and Class Members. The services and business offerings that Defendants ultimately provided were less valuable than what should have been delivered and what Defendants promised to deliver given Defendants' failure to fulfill the data security and privacy promises that were central to its service offerings.

194. Plaintiffs and the Class are accordingly entitled to damages in amounts to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Illinois Personal Information Protection Act**
**815 Ill. Comp. Stat. §§ 530/10(a), *et seq.***
**(On Behalf of Plaintiffs and the Classes)**

195. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

196. As corporations that handled, collected, disseminated, and otherwise dealt with nonpublic PII/PHI, Defendants were Data Collectors as defined in 815

Ill. Comp. Stat. § 530/5.

197. Plaintiff and Illinois Subclass members' PII/PHI (e.g., Social Security numbers, medical information, and health insurance information) includes personal information as covered under 815 Ill. Comp. Stat. § 530/5.

198. As a Data Collector, Defendants were required to notify Plaintiff and Illinois Subclass members of a breach of its data security system in the most expedient time possible and without unreasonable delay pursuant to 815 Ill. Comp. Stat. § 530/10(a).

199. By failing to disclose the Data Breach in the most expedient time possible and without unreasonable delay, Defendants violated 815 Ill. Comp. Stat. § 530/10(a).

200. Pursuant to 815 Ill. Comp. Stat. § 530/20, a violation of 815 Ill. Comp. Stat. § 530/10(a) constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act.

201. As a direct and proximate result of Defendants' violations of 815 Ill. Comp. Stat. § 530/10(a), Plaintiff and Illinois Subclass members suffered damages, as described above.

202. Plaintiff and Illinois Subclass members seek relief under 815 Ill. Comp. Stat. § 510/3 for the harm they suffered because of Defendants' willful violations of 815 Ill. Comp. Stat. § 530/10(a), including actual damages, equitable relief, costs, and attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. §§ 505, *et seq*. ("Illinois CPA")**
**(On Behalf of Plaintiffs and the Classes)**

203. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

204. Plaintiffs bring this claim, individually and on behalf of the Illinois Subclass, against Defendants for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §§ 505, *et seq*. ("Illinois CPA").

205. Defendants are "persons" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

206. Plaintiffs and Illinois Subclass members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

207. Defendants' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

208. Defendants' deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Illinois Subclass Members' PII/PHI, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security

and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Illinois Subclass Members' PII/PHI, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

f. Failing to timely and adequately notify Plaintiffs and Illinois Subclass Members of the Breach;

g. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Illinois Subclass Members' PII/PHI; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

209. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII/PHI.

210. Defendants intended to mislead Plaintiffs and Illinois Subclass Members and induce them to rely on its misrepresentations and omissions. Plaintiffs and Illinois Subclass Members reasonably relied on Defendants to advise them if their data security and data storage systems were not adequately secure to

protect their PII/PHI, the truth of which they could not otherwise have discovered.

211. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

212. Defendants acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiffs and Illinois Subclass members' rights.

213. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive acts and practices, Plaintiffs and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

214. Plaintiffs and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**NINTH CAUSE OF ACTION**
**Illinois Uniform Deceptive Trade Practices Act**
**815 Ill. Comp. Stat. §§ 530/10(a) *et seq*.**
**(On Behalf of Plaintiffs and the Classes)**

215. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as

if fully set forth herein.

216. Defendants are "persons" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

217. Defendants engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

a. Representing that goods or services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising goods or services with intent not to sell them as advertised; and

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

218. Defendants' deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Illinois Subclass Members' PII/PHI, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to

the security and privacy of Plaintiffs' and Illinois Subclass Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Illinois Subclass Members' PII/PHI, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Illinois Subclass Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

f. Failing to timely and adequately notify Plaintiffs and Illinois Subclass Members of the Data Breach;

g. Omitting, suppressing, and concealing the material fact that it did not

reasonably or adequately secure Plaintiffs' and Illinois Subclass Members' PII/PHI; and

h. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Illinois Subclass Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

219. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII/PHI.

220. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

221. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiffs and Illinois Subclass Members have suffered

and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

222. Plaintiffs and Illinois Subclass Members seek all monetary and nonmonetary relief allowed by law, including injunctive relief and reasonable attorneys' fees.

**TENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Classes)**

223. Plaintiffs restate the allegations in Paragraphs 1 through 115 above, as if fully set forth herein.

224. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

225. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and still are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

226. Given its authority under the Declaratory Judgment Act, this Court

should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to it;

d. Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

227. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the data entrusted to it.

228. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

229. If a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages— while warranted for out-of-pocket damages and other legally quantifiable and provable damages— cannot cover the full extent of Plaintiffs and Class Members' injuries.

230. If an injunction is not issued, the resulting hardship to Plaintiffs and

Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

231. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**PRAYER FOR RELIEF**

232. Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Classes, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Classes;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Classes;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Classes;

D. Enjoining Defendants from further unfair and/or deceptive practices;

E. Awarding Plaintiffs and the Classes damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiffs and the Classes in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiffs and the Classes leave to amend this complaint to conform to the evidence produced at trial;

J. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims so triable.

DATED: January 13, 2026

Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY, LLP**

By: */s/ Andrew J. Fuller*
Andrew J. Fuller, Fla. Bar No. 1021164
Thomas E. Loeser
(*pro hac vice forthcoming*)
1809 7th Avenue, Suite 1610
Seattle, WA 98101
Telephone: (206)-802-1272
Facsimile: (206)-299-4184
tloeser@cpmlegal.com
afuller@cpmlegal.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel
(*pro hac vice forthcoming*)
Barrett J. Vahle
(*pro hac vice forthcoming*)
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: 816-714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com

**COHENMALAD, LLP**
Lynn A. Toops
(*pro hac vice forthcoming*)
Amina A. Thomas
(*pro hac vice forthcoming*)
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
F: (317) 636-2593
ltoops@cohenmalad.com
athomas@cohenandmalad.com

**WAGSTAFF & CARTMELL LLP**
Tyler W. Hudson
(*pro hac vice forthcoming*)
Eric D. Barton
(*pro hac vice forthcoming*)
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1177
Tel: (816) 701 1100
thudson@wcllp.com
ebarton@wcllp.com

*Attorneys for Plaintiffs and the Putative Classes*